<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| M.K., on her behalf and on behalf of her minor son, R.K., | : | |
| Plaintiffs, | : | Civil Action No. 06-4499 (JAG) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ROSELLE PARK BOARD OF EDUCATION, | : | |
| Defendant. | : | |

<u>**GREENAWAY, JR., U.S.D.J.**</u>

This matter comes before this Court on (1) the motion of Plaintiff M.K., on her behalf and on behalf of her minor son, R.K., for a preliminary injunction; and (2) the motion of Defendant Roselle Park Board of Education (the "Board" or "Defendant") to dissolve the temporary restraining order entered on September 26, 2006 (the "TRO"), by the Honorable Dickinson R. Debevoise, United States District Judge.[1]  The TRO, which was entered on the motion of Plaintiff, pursuant to the Individuals with Disabilities Education Act ("IDEA"), ordered, *inter alia*, that Defendant (1) continue the placement of R.K. at Children's Specialized Hospital ("CSH") in Fanwood, New Jersey; (2) be restrained from commencing any action against M.K. for asserting her rights under the IDEA; and (3) be temporarily restrained from placing R.K. at its in-district, public school placement with the services of a paraprofessional.

_____

[1]Judge Debevoise has since recused himself, and this matter has come before this Court.

1

(Docket Entry No. 2.)  Additionally, Judge Debevoise ordered that Defendant show cause on October 3, 2006, why it should not be preliminarily enjoined from placing R.K. in its in-district program, and compelled to place him in the Children's Center of Monmouth County in Neptune ("Monmouth"), or an out-of-district private placement that is similar to the Children's Specialized Hospital with an appropriate one-on-one Registered Nurse ("RN") and related services.  On September 27, 2006, Defendants submitted their request for dissolution of the TRO.

On September 29, 2006, this matter was transferred from Judge Debevoise to this Court. After this Court received the parties' initial briefing, and held a series of status conferences with the parties to address various deficiencies in their pleadings, this Court ordered that the parties submit supplemental submissions so that it could properly adjudicate the issues before it.  This Court set a hearing on Plaintiff's motion for a preliminary injunction and Defendant's motion to dissolve the TRO for October 18, 2006.  For the following reasons, based on its review of the parties' written submissions and oral argument, this Court grants Plaintiff's motion for a preliminary injunction, and grants Defendant's motion to dissolve the TRO.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    R.K.'s Medical Condition

R.K. is an eight year old boy who has been enrolled as a student in the Roselle Park School District since March 2004.  He is eligible for special education and related services under the classification of "Multiply Disabled."  (Complaint ("Compl."), ¶ 3; Brief in Opposition To Plaintiff's Request For Injunctive Relief And In Support Of The District's Request To Vacate Temporary Restraints ("Def.'s Br.") at 1.)  R.K. allegedly suffers from various medical problems

2

involving his heart, lungs, liver and immune system.  (Compl., ¶ 3.)  Additionally, R.K. suffers

cognitive impairment, communication impairment, and other health impairments.  (Def.'s Br. at

1.)  Plaintiff M.K. is the mother of R.K.  (Compl., ¶ 4.)

Plaintiff alleges that R.K. was classified as pre-school disabled in 2001, and was unable

to attend school until he was placed at CSH, a private school for the handicapped.  (Id., ¶ 6.)  She

further contends that R.K.'s condition, which limits him to the receipt of medications and

nourishment through a nasal gastric tube, requires that he be provided with one-on-one

supervision by an RN during school and transportation on a daily basis.  (Id., ¶ 7.)  Plaintiff also

asserts that R.K. has been authorized by Medicaid to receive twelve hours per day of private duty

nursing services, seven days a week.  (Id.)

R.K.'s most recent physical therapy evaluation, conducted on July 21, 2006, reflects that

R.K. "can move from sitting to quadruped to kneeling to half-kneel with support to standing."

(Plaintiffs' Brief & Supplemental Evidence In Support Of Stay-Put Injunction ("Pl.'s Supp.

Br."), Exh. 5, Affidavit Of Mary Kozlik ("Kolzlik Aff."), Exh. A, July 2006 Physical Therapy

Report ("P.T. Rept.").)   "He can kneel walk independently a few feet."  (Id.)  R.K. is also

"limited now to a small 4-step staircase with 2 rails for support," which he "can ascend and

descend with supervision to occasional contact guard."  (Id.)

**B.    <u>Treatment Of R.K. By The Roselle Park School District</u>**

In March 2004, M.K. moved with R.K. into the Roselle Park School District (the

"District").  (Compl., ¶ 8.)  In June 2004, an Individualized Education Program ("IEP") was

developed for R.K., which included: (1) a one-on-one nurse; (2) transportation; (3) placement in

a self-contained placement in an approved private school, outside of the district; (4) an extended

3

school year program ("ESY"); and (5) occupational therapy, physical therapy, and speech and language therapy.  (Id., ¶ 9.)  As part of his IEP, R.K. was provided nursing services through a private agency while he was in school at CSH.  (Id.)

In March 2005, the District Director of Special Services, Tracey Maccia, and a case manager, observed R.K. at CSH, and based on that observation, decided to transfer R.K. from CSH to an in-district placement – the Multiply Disabled Program at Aldene School ("in-district program").  (Id., ¶¶ 10-12.)  The District advised CSH that R.K. would be transferred to the in-district program effective July 5, 2005.  (Id., ¶ 12.)  Defendant contends that its in-district program was modeled after the CSH program.  (Certification Of Tracey Maccia ("Maccia Cert."), ¶ 2.)

On July 5, 2005, the first day of the ESY, M.K. learned that the District had hired a Licensed Practical Nurse ("LPN") in lieu of an RN to attend to R.K. at CSH, and to receive training from the RN who had been treating R.K.  (Id., ¶ 14.)  Plaintiff alleges that several letters had been sent to the District by R.K.'s physician, advising the District that R.K. required the services of a RN.  (Id.)  M.K. objected to the use of the LPN, and on July 11, 2006, provided another letter from R.K.'s doctor reiterating R.K.'s need for RN services.  (Id., ¶¶ 15-16.)

The parties agreed to meet in September 2005 to conduct a re-evaluation planning meeting, at which the District would review and/or revise R.K.'s IEP.  (Id., ¶ 18.)  On September 20, 2005, a re-evaluation meeting was held at CSH, at which Dr. Gozo, R.K.'s primary pediatrician, reiterated that R.K. required the services of an RN, and the District agreed to conduct a re-evaluation.  (Id., ¶ 19.)  After the re-evaluatuon, although an IEP was developed to allow R.K. to remain at CSH for the remainder of the 2005-2006 academic year, the District

refused to include a provision for one-on-one RN services in R.K.'s IEP.  (Id., ¶ 20.)

### C.     Administrative Complaints And Adjudication

On October 20, 2005, one month into the 2005-2006 school year, M.K. filed a due

process petition with the District, requesting that it modify R.K.'s 2005-2006 IEP to provide one-

on-one RN services for R.K., and incorporate nursing objectives and protocols.  (Id., ¶ 21;

Plaintiffs' Brief in Support Of Stay-Put Injunction ("Pl.'s Br.") at 2.)  Plaintiff contends that this

due process complaint remains unresolved.  (Pl.'s Br. at 2.)

On February 9, 2006, M.K. filed for emergent relief to compel the District to (1) permit

M.K. to arrange, through independent nursing agencies, for one-on-one RN services for R.K.

during school and transportation; and (2) provide R.K.'s student records to prospective out-of-

district placements.  (Compl., ¶ 23.)  On May 15, 2006, an emergency relief hearing was

convened before Administrative Law Judge Caridad Rigo (the ALJ).  The ALJ found the issues

presented by M.K.'s petition non-emergent because, as demonstrated by the testimony of

Medicaid representative Steven Tunney, Plaintiff was receiving, and would continue to receive,

one-on-one RN services through Medicaid.  (Certification Of Plaintiffs' Attorney ("Pl.'s Cert."),

Exh. 3, Transcript of May 15, 2006 Proceedings; Defendant's Exhibit List ("Def.'s Exhs."), Exh.

E, Transcript of May 15, 2006 Proceedings.)

On May 31, 2006, the parties convened again before the ALJ to hear testimony on behalf

of the Plaintiff regarding Plaintiff's contention that R.K. required one-on-one nursing care.  (Pl.'s

Cert., Exh. 2, Transcript of May 31, 2006 Proceedings.)  Following this hearing date, on June 15,

2006, the District filed a motion to dismiss on the ground that Plaintiff's due process petition was

limited to the 2005-2006 school year.  The ALJ denied the District's motion on July 18, 2006, on

the ground that the nursing issue was "capable of repetition, yet evading review."  (Def.'s Br. at 4.)

On August 3, 2006, the parties convened an IEP meeting, during which the parties were to discuss R.K.'s placement for the 2006-2007 school year.  R.K. had attended CSH since 2001, but was aging out of the program because CSH is not state approved beyond the age of seven; R.K. was turning eight.  (Maccia Cert., ¶¶ 10-11.)  It is undisputed that both parties had been aware of this fact throughout the pending litigation, and knew that R.K.'s last day at CSH was August 18, 2006.  (Def.'s Br. at 4.)  At the August 3 meeting, Defendant proposed an IEP for the 2006-2007 school year, which placed R.K. in the in-district program.  (Def.'s Br. at 4.)

Also, on August 3, 2006, M.K. filed a second due process petition regarding R.K.'s placement and IEP for the 2006-2007 school year.  (Compl., ¶ 27; Def.'s Br. at 4.)  On August 14, 2006, Plaintiff filed a motion requesting that her August 3, 2006 due process petition be converted into a petition for emergency relief.  (Def.'s Exhs., Exh. B, Aug. 14, 2006 Request for Emergency Relief.)  The emergency relief sought by Plaintiff included the placement of R.K. at Monmouth pending resolution of the instant dispute (Id.)  Specifically, M.K. seeks to have R.K. placed at Monmouth, a placement which would require R.K. to ride on a school bus for over one hour each way.  (Def.'s Br. at 1; Maccia Cert., ¶ 7.)

After receiving briefing from both parties, and hearing oral argument on Plaintiff's request for emergency relief, on September 14, 2006, the ALJ rejected Plaintiff's argument that an "out-of-district" placement for R.K. was required under the IDEIA's "stay-put" provision, ruled that the "stay put" placement for R.K. pending the outcome of Plaintiff's due process petition was to be the in-district program.  (Def.'s Exhs., Exh. A, September 14, 2006, Order on

Emergent Relief.)

On September 15, 2006, M.K. requested that CSH allow R.K. to remain at CSH pending an appeal for injunctive relief to this Court.  CSH agreed to permit R.K. to remain in its program until October 13, 2006.  (Compl., ¶ 29; Pl.'s Cert., Exh. 4, Letter Regarding Keeping R.K. at CSH.)  Then, on September 20, 2006, Plaintiff filed a motion for a preliminary injunction and a proposed Order to Show Cause with Temporary Restraints, seeking injunctive relief in response to the ALJ's September 14, 2006 order.

### D.   **The Facilities At Issue**

To aid this Court in its determination of where R.K. should be placed pending the outcome of the due process petition before the ALJ, the parties have proffered evidence of the physical plant and services offered at five separate facilities, which purport to serve multiply disabled children.  The nature of these facilities is as follows:

### 1.   *CSH*

CSH, the school R.K. currently attends, is located in Fanwood, New Jersey, 6.43 miles (or approximately 15 minutes) from R.K.'s home.  (Pl.'s Supp. Br., Exh. 1, Affidavits Of Pamela Venckus ("Venckus Affs."), Certification, ¶ 1; Supplemental Certification Of Tracey Maccia ("Maccia Supp. Cert."), ¶¶ 4, 6.)  Certification Of Isabel Machado, Esq. ("Machado Cert."), Exh B, Chart.)  The school, which is classified as servicing multiply disabled children, provides services for children who are up to eight years old, and has a 2:1 student to staff ratio.  (Machado Cert., Exh. B, Chart; Maccia Supp. Cert, ¶ 5.)

CSH employs "full-time related service providers, including speech therapists, occupational therapists, physical therapists, and multiple registered nurses."  (Venckus Affs.,

Certification, ¶ 9.)  These individuals provide their services in several separate rooms within the

school; different therapies (e.g., speech, language, and physical therapy) are never simultaneously

provided within a single room.  (Id., ¶ 9.)  At CSH, speech therapy includes oral-motor and

feeding programs, as well as language skills development.  (Id., ¶ 10.)

The entrance to R.K.'s classroom at CSH is located on the ground level, and there are

elevators in the CSH building to provide transportation between the floors for students who

cannot navigate stairs.  (Id., ¶¶ 5-6.)  Classrooms for students, such as R.K., who are not toilet-

trained, include private bathrooms with a toilet, sink, and area for changing students' diapers.

(Id., ¶ 3.)  CSH also has a nursing office with a waiting area, an examination area, a rest area

with privacy, and toilet facilities for children with disabilities.  (Id., ¶ 7.)

### 2.    *In-District*

The in-district program, which is located in Roselle Park, New Jersey, is .82 miles (or

approximately 5 minutes) from R.K.'s home.  (Machado Cert., Exh. B, Chart.)  The school's

program for special needs children is classified as servicing multiply disabled children up to the

age of twenty-one, and has a 2:1 student to staff ratio.  (Id.; Maccia Supp. Cert., ¶¶ 7, 9.)

Defendant contends that its in-district program services were modeled after the CSH

program.  (Maccia Cert., ¶ 2.)  Like CSH, the in-district program provides speech and language

therapy, occupational therapy, physical therapy, feeding therapy, daily transportation, the

provision of RN services, and other support services.  (Maccia Supp. Cert, ¶ 7.)  Defendant

employs qualified staff members who are certified to provide these services at the in-district

facility.  (Id., ¶ 11.)

The building in which the in-district program is located is currently under construction,

which Defendant anticipates will be completed by mid-November 2006.  (Id., ¶ 17.)  The in-district program is on the lower level of the school building; to get to and from his classroom, R.K. would have to navigate 12 steps.  (Id., ¶ 19.)  As Defendant conceded at the hearing, there is currently no operational elevator to transport R.K. to the level of his classroom.  (Id., ¶ 21.)  The classroom does not contain a bathroom or working sink.  (Affidavit Of Mary Kozlik ("Kozlik Aff."), ¶ 3.)

There is an open and public boys' restroom located across the hall and 24 feet from the classroom R.K. would occupy.  (Maccia Supp. Cert., ¶ 19.)  This restroom contains several urinals and stalls, all of which are too large and difficult to operate for someone with R.K.'s condition and of his stature (he is 3'6" and 45 pounds).  (Kozlik Aff., ¶ 3.)  The nurse in Defendant's employ at the in-district program indicates in her affidavit that the boys' restroom can accommodate R.K.'s toileting needs.  (Certification Of Barbara Gross, RN ("Gross Cert."), ¶ 9.)  At the hearing, Plaintiff represented that this bathroom is not handicap-accessible, and a review of the photographs proffered leads this Court to concur.  (Maccia Supp. Cert., Exh. C.)

There is a nurse's station located on the same hallway as R.K.'s classroom.  (Gross Cert., ¶ 9.)  According to M.K., this office does not have a bathroom or adequate space for feeding, administration of medication, or changing.  (Kozlik Cert., ¶ 8.)  The in-district's RN, however, contends that her office will accommodate R.K.'s toileting needs.  (Gross Cert., ¶ 9.)

At the in-district facility, R.K.'s therapies would be conducted in the "multipurpose" room, which is located approximately 72 feet from his classroom.  (Gross Cert., ¶ 7.)  This multipurpose room looks like a large cafeteria with long tables and benches throughout the area. (Maccia Supp. Cert., Exh. C.)  At the hearing on the parties' motions, Defendant represented that

a portion of this common space would be partitioned off when R.K. receives his therapies.

### 3. *Monmouth*

The Monmouth facility, which is located in Neptune, New Jersey, is 39.66 miles (or approximately one hour) from R.K.'s home.  (Kozlik Cert., Exh. D, Excerpts from Monmouth website; Maccia Cert., ¶ 7.)  The school, which is classified as servicing multiply disabled children, provides services for children who are up to eight years old, and has a 4:1 student:staff ratio.  (Machado Cert., Exh. B, Chart; Maccia Supp. Cert, ¶ 4.)

Monmouth provides coordinated physical, occupational, and speech and language therapies; a feeding program; sign language training; toilet training; and the use of augmentative communication devices.  (Kozlik Cert., ¶ 12.)  The school also has multiple RN's on staff.  (Kozlik Cert., Exh. D, Excerpts from Monmouth website.)

The physical plant at Monmouth consists of several buildings all on one level.  (Kolzik Cert., ¶¶ 10, 12.)  All therapies for each student at Monmouth are performed in the same building where the student's classroom is located.  (Id., ¶ 12.)  The Monmouth program has private bathrooms in the classroom or facilities to meet the needs of disabled students, as well as speech and language services with adequate separate therapy rooms and space to conduct these therapies.  (Id., ¶ 10.)

### 4. *Lakeview*

The Lakeview School ("Lakeview") is located in Edison, New Jersey, 15 to 20 minutes from R.K.'s home.  (Kozlik Cert., ¶ 11, Exh. C, Lakeview handbook.)  The school serves multiply disabled students through age twenty-one, and has a 2:1 student to staff ratio in each classroom.  (Id.)

Some of the benefits of the Lakeview program include coordinated services of therapists trained and certified in speech and language therapy, physical therapy, and occupational therapy. (Id.)  Lakeview also retains the services of consultants in developmental pediatrics, physiatry, and orthopedics.  (Id.)  Adaptive physical education, augmentative communication assessments and training, and adaptive seating evaluations are also offered.  (Id.)  Lakeview also has a feeding clinic staffed by certified speech and language pathologists.  (Id.)

The Lakeview facility is handicapped accessible, and R.K.'s classroom would be on the ground level of the school.  (Kozlik Cert., ¶ 10.)  Additionally, the school has private bathrooms in the classroom or other facilities that meet the needs of disabled students, such as R.K.  (Id.)  Additionally, Lakeview houses adequate separate therapy rooms and space to conduct the therapies prescribed by R.K.'s IEP.  (Id.)

### 5.   *Jardine*

The Jardine Academy ("Jardine") is located in Union, New Jersey, which is 10 minutes from R.K.'s home.  (Def.'s Br., Exh. 5, October 16, 2006 Letter Of Laura Del Luca ("Luca Letter").)  The school services multiply disabled children.  (Id.)

Jardine employs full time related service providers including speech therapists, occupational therapists, and multiple registered nurses.  (Id.)  These related services are provided in several separate rooms within the school.  (Id.)  Speech and language therapy and physical therapy are also provided when appropriate.  (Id.)  Oral-motor and feeding programs are also available.  (Id.)

The Jardine classrooms are located on the ground level of the facility, and are handicap-accessible.  (Id.)  The classrooms include private bathrooms with a toilet, sink and an area for

11

changing student's diapers.  (Id.)  These facilities meet the needs of disabled students, such as R.K.  (Kozlik Cert., ¶ 10.)  Jardine also houses a nursing office with an examination area, a nurse's area, and a rest area with privacy for children with disabilities.  (Luca Letter.)

## II.  DISCUSSION

### A.   Applicable Legal Standards

**1.**   *Legal Standard Governing Review Of An Administrative Law Judge's Decision Pursuant To The IDEA*

Any party aggrieved by a decision made under the IDEA by a state educational agency has a right to bring a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).  This Court has jurisdiction over those actions "without regard to the amount in controversy."  20 U.S.C. § 1415(i)(3)(A).

The IDEA provides that when a federal district court reviews an administrative adjudication, the court: (i) shall receive records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.  20 U.S.C. § 1415(i)(2)(C).

"[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review."  Susan N. v. Wilson School Dist., 70 F.3d 751, 757 (3d Cir. 1995) (quoting Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993)).  "Because the IDEA specifically requires a district court to "receive the records of the administrative proceedings, . . . hear additional evidence at the request of a party, and, basing its

decision on the preponderance of the evidence," grant any appropriate relief, 20 U.S.C. §

1415(e)(2), a district court 'does not use the substantial evidence standard typically applied in the

review of administrative agency decisions, 'but instead must decide independently whether the

requirements of the IDEA are met.'' " Id.  (quoting Murray v. Montrose County Sch. Dist., 51

F.3d 921, 927 (10th Cir. 1995) and Board of Educ. v. Illinois State Bd., 41 F.3d 1162, 1167 (7th

Cir. 1994)).

      In IDEA cases, a district court is required to give "due weight" to the factual findings in

state administrative proceedings.  See Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).  The

Third Circuit has defined such "due weight" as "modified *de novo*" review.  S.H. v. State-

Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003).  Under this modified *de novo* review

standard, "'a district court is required to make findings of fact based on a preponderance of the

evidence contained in the complete record, while giving some deference to the fact findings of

the administrative proceedings.'"  Id. (Quoting Knable v. Bexley City Sch. Dist., 238 F.3d 755,

764 (6th Cir. 2001)).   For questions of law, a district court applies a *de novo* standard to the

review of administrative decisions in IDEA cases.  See P.N. v. Greco, 282 F. Supp. 2d 221, 235

(D.N.J. 2003) (citing L.M. ex rel. H.M. v. Evesham Twp. Bd. of Educ., 256 F. Supp. 2d 290, 295

(D.N.J. 2003)).

      **2.**    ***Legal Standard Governing Motions For Preliminary Injunctions***

      "'[A] district court may permissibly grant the 'extraordinary remedy' of a preliminary

injunction only if '(1) the plaintiff is likely to succeed on the merits; (2) denial will result in

irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to

the defendant; and (4) granting the injunction is in the public interest.'"  P.C. Yonkers, Inc. v.

Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005) (quoting Nutrasweet Co. v. Vit-Mar Enterprises, 176 F.3d 151, 153 (3d Cir. 1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir.1998))).  "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."  Id. (citing Nutrasweet, 176 F.3d at 153).[2]

### 3.    *Legal Standard Governing Motions To Dissolve A TRO*

Pursuant to FED. R. CIV. P. 65(b), "[o]n 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require."  While "Rule 65(b) establishes a procedure whereby the party against whom a temporary restraining order has issued can move to dissolve or modify the injunction, upon short notice to the party who obtained the order," as the Supreme Court has found, "[s]ituations may arise where the parties, at the time of the hearing on the motion to dissolve the restraining order, find themselves in a position to present their evidence and legal arguments for or against a preliminary injunction."  Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 441 (1974).  The Supreme Court found that "[i]n such circumstances, of course, the court can proceed with the hearing as if it were a hearing on an application for a preliminary injunction.  At such hearing, as in any other hearing

---

[2]"[A] request to enjoin a preexisting 'stay put' order is handled appropriately by the district court's application of traditional preliminary injunction analysis."  Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal., 287 F.3d 1176, 1180 (9th Cir. 2002).  See also Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 188 (3d Cir. 2005) (agreeing with the holding and reasoning in Johnson).

in which a preliminary injunction is sought, the party seeking the injunction would bear the burden of demonstrating the various factors justifying preliminary injunctive relief, such as the likelihood of irreparable injury to it if an injunction is denied and its likelihood of success on the merits." Id.

Here, because the parties have had a full opportunity to argue and brief the issues raised by Plaintiff's motion for a preliminary injunction, this Court will adjudicate Defendant's request to dissolve the TRO as if it were a hearing on the application for a preliminary injunction. Accordingly, through this Opinion and accompanying Order, this Court adjudicates both Plaintiff's motion for a preliminary injunction, and Defendant's request that the TRO entered by Judge Debevoise be dissolved.

### B.   The ALJ's Stay-Put Determination Is Ripe For Adjudication In This Court

Defendant contends that the ALJ's September 14, 2006 order is not ripe for adjudication before this Court because it is an interim order with regard to stay-put placement.  Plaintiff acknowledges that stay-put determinations are interim placement decisions, but contends that stay-put orders are ripe for adjudication because they are final as to the issue of where a child will be placed while his other claims are adjudicated.

The stay-put provision of the IDEA provides that "during the pendency of any proceedings conducted pursuant to [20 U.S.C. § 1415], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  20 U.S.C. § 1415(j).  "Stay-put orders are designed to maintain the status quo during the course of proceedings." J.O. ex rel. C.O. v. Orange Tp. Bd. of Educ., 287 F.3d 267, 272 (3d Cir. 2002); see also Schaffer ex rel. Schaffer v. Weast, 126 S.Ct. 528, 539 n.1

(2005).  They "function[ ], in essence as an automatic preliminary injunction."  J.O., 287 F.3d at

272 (quoting Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir. 1996) (describing the

stay-put provision as "an absolute rule" to maintain the current educational placement

"regardless" of the merits of the case)).

       While this Court can locate no authority expressly addressing the implications of the

ripeness doctrine on this Court's jurisdiction to enjoin stay-put orders entered by an ALJ, the

weight of authority indicates that district courts have the power to review and enjoin ALJ stay-

put orders immediately, notwithstanding the fact that they are interim orders.  See Murphy v.

Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 199 (2d Cir. 2002) (the reasoning behind

the stay-put rule is that "[t]he administrative process is 'inadequate' to remedy violations of §

1415(j) . . . [G]iven the time sensitive nature of the IDEA's stay-put provision, 'an immediate

appeal is necessary to give realistic protection to the claimed right.'") (quoting Miss Am. Org. v.

Mattel, Inc., 945 F.2d 536, 545 (2d Cir. 1991); Johnson, 287 F.3d at 1180 ("request to enjoin a

preexisting 'stay put' order is handled appropriately by the district court's application of

traditional preliminary injunction analysis"); Cf., Solin ex rel. Solin v. Riverton Borough Bd. of

Educ., 143 Fed. Appx. 491, 492-93 (3d Cir. Aug. 15, 2005) ("Had the school district been denied

interlocutory review until the District Court issued its final order on the merits of the IDEA

action, the school district's ability to legally test the validity of the stay-put order and to avoid the

concomitant and continuing financial obligations would have been impossible.  Appellate review

at the termination of all district court proceedings might impair the school district's ability to

recoup some or all of the funds it continued to expend in compliance with the stay-put order.

Interlocutory review had the potential of avoiding this result precisely because Raelee S. was still

in school").

In light of this authority, this Court finds that because the issue of whether the ALJ's stay-put order is proper is final as to where R.K. will remain while the underlying due process petition is pending, Plaintiff's instant motion, which seeks to enjoin the ALJ's order, is ripe for adjudication.

### C.    Whether Plaintiff Is Likely To Succeed On The Merits Of Her Claim

####       1.    *Legal Standard Governing Motions For Stay-Put Provisions*

A parent can invoke the IDEA's stay-put provision when the school system proposes "a fundamental change in, or elimination of, a basic element of the [then-current education placement]." Lunceford v. Dist. of Columbia Bd. of Educ., 745 F.2d 1577, 1582 (D.C. Cir. 1984).  A parent moving for a stay-put injunction "must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement." Id.

"[T]he plain meaning of 'current educational placement' refers to the 'operative placement actually functioning at the time the dispute first arises.'"[3] Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 192 (3d Cir. 2005) (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625-626 (6th Cir. 1990)).  Although the IDEA does not define the term "then-current educational placement," the meaning of the term "falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP." Bd. of Educ. of Cmty

---

[3]This Court finds that it is not relevant that R.K. was at a placement other than CSH when the TRO was adjudicated.  Because it is uncontroverted that R.K. was at CSH when the underlying due process petition was filed, CSH is R.K.'s "current educational placement" for purposes of the stay-put provision.

High Sch. Dist. No. 218, 103 F.3d at 548; see also  Tilton v. Jefferson County Bd. of Educ., 705 F.2d 800, 804 (6th Cir. 1983), cert. denied, 465 U.S. 1006 (1984) (transfer from one school to another school with comparable program is not a change in educational placement); Spilsbury v. Dist. of Columbia, 307 F. Supp. 2d 22, 26-27 (D.D.C. 2004) (explaining that "the IDEA clearly intends 'current educational placement' to encompass the whole range of services that a child needs" and that the term "cannot be read to only indicate which physical school building a child attends").

Accordingly, if a child's then-current educational placement is not available, the school system must provide the student with placement in a similar program during the pendency of administrative and judicial proceedings on the merits of his due process challenge to the proposed IEP.  Knight v. Dist. of Columbia, 877 F.2d 1025, 1029 (D.C. Cir. 1989); McKenzie v. Smith, 771 F.2d 1527, 1533 (D.C. Cir. 1985).

### 2.   *Whether The ALJ's Stay-Put Order Contravenes The IDEA*

Both parties acknowledge that R.K. cannot be permitted to remain at CSH because he has aged out of the program.[4]  Additionally, neither party contests that R.K. has the right, pursuant to the IDEA's stay-put provision, to attend a facility that is comparable to CSH.  Plaintiff contends that such a facility must be a private, out-of-district school that provides one-on-one RN services for R.K.  Defendant argues that the in-district program, which the ALJ has ordered R.K. to attend, is comparable to CSH, and satisfies the stay-put provision.

---

[4]Because R.K. has aged out of CSH, the TRO entered by Judge Debevoise must be dissolved.  This Court will not order R.K. to remain in a school which is not certified to serve him.

18

      **a.**      **The Stay-Put Provision Does Not Mandate That Services Be Private Or Out-Of -District To Be Similar To The Then-Current Educational Placement**

This Court first finds that so long as it provides comparable services, R.K.'s stay-put placement need not be private or out-of-district to comply with the IDEA.  See Lunceford v. District of Columbia Bd. of Educ., 745 F.2d 1577 (D.C. Cir. 1984) (no change in educational placement where District switched student from residential program in a private hospital to a public institution); Tilton, 705 F.2d at 804 (transfer from one school to another with comparable program not a change in educational placement); Concerned Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. New York City Bd. of Educ., 629 F.2d 751, 754 (2d Cir. 1980) (transfer from one school to another within same district with similar but less innovative programs not a change in educational placement within meaning of the IDEA).  To the extent Plaintiff contends that R.K. should be placed at Monmouth, Lakeview, or Jardine, as opposed to the in-district facility, because they are similarly private and out-of-district, this factor is unlikely to affect the ultimate determination on the merits of her challenge.

      **b.**      **The In-District Program Is Not Sufficiently Similar To CSH**

While there is significant evidence indicating that the in-district program was in fact modeled after the CSH program (Maccia Cert., ¶ 2.) and provides comparable educational, health, and education services (Venckus Affs., Certification, ¶¶ 9, 10.), the uncontroverted evidence before this Court demonstrates that the in-district facility's current physical plant renders it inadequate to serve R.K.'s needs.  First, unlike the ground-level handicap-accessible classroom at CSH (Venckus Affs., Certification, ¶ 5-6.) , the in-district facility would require

R.K. to navigate 12 steps when going to and from his classroom.  (Maccia Supp. Cert, ¶ 19.)  As R.K.'s most recent physical therapy report demonstrates, R.K. is currently unable to navigate those steps, even with assistance.  ( P.T. Rept.)  Second, unlike CSH, the in-district facility does not currently have bathrooms or private toileting facilities appropriate for a child of R.K.'s size with R.K.'s disabilities.  (Compare Venckus Affs., Certification, ¶ 3 with Kozlik Aff. ¶ 3; Maccia Supp. Cert., ¶ 19.)  Third, unlike CSH, the in-district facility lacks adequate separate space in which R.K. can receive his therapies.  The record indicates that R.K. would be provided with his therapies in a cafeteria-like "multipurpose" space open to the entire school with long tables and benches, and that a small area would be partitioned off for R.K.  (Gross Cert., ¶ 7; Maccia Supp. Cert., Exh. C.)  Such partitioning of a common space open to all children does not qualify as a therapy room comparable to those offered at CSH.  (Venckus Affs., Certification, ¶ 9.)  This Court finds that these three disparities between CSH and the in-district facilities render the in-district program significantly distinct from CSH, such that placement of R.K. at that facility would violate the IDEA's stay-put provision.  See Knight, 877 F.2d at 1029; McKenzie, 771 F.2d at 1533.

While Defendant claims that the currently ongoing construction at the in-district facility will remedy these deficiencies, this Court must evaluate the facility as it exists now in determining R.K.'s interim placement.  The physical problems with the in-district facility as it currently exists render it inadequate and significantly dissimilar from the facilities at CSH, which, as explained, include a ground-level entrance, proper bathroom facilities for a child with R.K.'s disabilities and toilet training needs, and a separate private area for the various therapies R.K. requires.  The ALJ's finding that the in-district facility is the proper stay-put placement for

R.K. must be enjoined.

          **c.**          **The Stay-Put Provision Requires Defendant To Continue To Provide One-On-One RN Services For Plaintiff**

This Court also finds that to the extent Defendant fails to provide one-on-one RN services for R.K. at the in-district or any other facility, and to the extent that the ALJ's order provides that such services are not necessary under the stay-put provision, the ALJ's order contravenes the IDEA.[5]

A shift in the provision of medication and nourishment through a medically-trained and certified RN working one-on-one with the child to the provision of such services by a LPN, who has not been trained as extensively as an RN, and may not work one-on-one with the child, surely constitutes a "change in educational placement" under the IDEA.  Compare  Lunceford, 745 F.2d at 1582-84 ("The main change appellee-surrogate parent has alleged is in the feeding treatment Pierce will receive at Forest Haven.  Appellee does not dispute that Pierce will be fed on a one-to-one basis at Forest Haven, as he is in HSC, or that the Forest Haven feeding program was developed by a nutritionist.  Appellee contends only that the overworked Forest Haven staff cannot administer its feeding program as well as HSC administers its program.  This can be a

_____

[5]This Court notes that while a central question posed by Plaintiff's August 2006 petition for emergent relief concerned the necessity of providing one-on-one nursing services for R.K. (See Def.'s Exhs.,  Aug. 14, 2006 Request for Emergency Relief), the ALJ failed to address whether such services are necessitated by the stay-put provision in the body of his order. Notwithstanding the ALJ's failure to address the nursing issue expressly raised in Plaintiff's petition, this Court may now decide whether such services must be maintained during the pendency of Plaintiff's action under the IDEA because a petition for a proper stay-put provision in this Court does not necessitate administrative exhaustion.  See Murphy, 297 F.3d at 199-200 (carving out an exception to the IDEA administrative exhaustion requirement for appeals of stay-put determinations by an ALJ).

problem, and the subject of a complaint and hearings under the EAHCA.  But it is not alone sufficient to constitute a change in educational placement, requiring the District to keep Pierce at HSC or a comparable facility until hearings are completed") (internal citations omitted).

Based on this analysis, this Court finds that to the extent the ALJ's order indicates that one-on-one RN services need not be provided for R.K. by the District, the ALJ's order contravenes the IDEA's stay-put provision.[6]

In sum, this Court finds that because of the deficiencies in its physical plant, placing R.K. at the in-district program contravenes the stay-put provision.  Additionally, this Court finds that placing R.K. in any facility that is comparable to CSH without the benefit of one-on-one RN services effectively eliminates a basic benefit provided as part of R.K.'s then-current placement.  Thus, Plaintiff is likely to succeed on the merits of her challenge to the ALJ's stay-put order because the in-district facility, as it currently operates, is not sufficiently similar to the CSH facility, and the ALJ's stay-put order fails to mandate the provision of one-on-one RN services for R.K. pending the ALJ's determination of Plaintiff's due process petition.

**D.    Whether Plaintiff Will Suffer Irreparable Harm If The Requested Injunctive Relief Is Not Granted**

As this Court explained *supra*, immediate interlocutory review of an ALJ's decision as respects a stay-put order is permissible because "[t]he administrative process is inadequate to remedy vioaltions of § 1415(j)."  Murphy, 297 F.3d at 199.  Accordingly, where a stay-put order

_____

[6]The District has acknowledged its obligation to provide interim RN services.  At the hearing on the pending motions, the District indicated that regardless of the outcome of this Court's ruling, it would continue to make sure R.K. is provided with one-on-one RN services pending the ALJ's final determination of Plaintiff's due process petition.

deprives a child of his rights under the IDEA, that child will be irreparably harmed.

This Court also finds that the in-district school poses inordinate obstacles to R.K.'s ability to attend, function, and learn at the facility. As this Court has explained, the in-district facility would require R.K. to navigate 12 steps to get to his classroom (which he cannot do); lacks adequate toileting facilities; and does not have a separate private area for R.K. to receive his various therapies. All of these problems with the current physical plant at the in-district facility would cause Plaintiff to suffer irreparable harm in that he would be unable to get to his classroom without significant strain and difficulty; he would be unable to continue his toilet-training and would have great difficulty using the toilet facilities currently available; and he would not get the full benefit of the therapies which he has been receiving at CSH in separate designated therapy rooms. This Court finds, as a result, that R.K. will suffer irreparable harm if an injunction is not entered to correct the apparent errors in the ALJ's order.[7]

### E.   Balancing Of The Hardships

This Court cannot issue a preliminary injunction if doing so will result in irreparable harm to the Defendant. P.C. Yonkers, Inc., 428 F.3d at 508. Defendant contends that an order directing that R.K. be placed at Monmouth during the pendency of Plaintiff's due process petition would cause both Defendant and R.K. to suffer great harm such that the balance of the hardships weighs against granting Plaintiff's motion for a preliminary injunction. Defendant

---

[7]Defendant notes that, by November, the physical plant at the in-district facility will be different, i.e., the changes Plaintiff seeks will have been instituted. These predictions have been off before. This Court may not rule based on promises of future action, but instead must focus on the state of the respective facilities at the time of the ruling. Lon Tai Shing Co., Ltd. v. Koch + Lowy, No. 90 Civ. 4464(DNE), 1991 WL 170734, at *38 (S.D.N.Y. June 20, 1991) ("promises of future actions cannot by themselves justify a refusal to grant any injunctive relief").

does not specify what harm it would suffer, but argues that R.K. would be negatively impacted by a constant change in placement if he is moved now from CSH to Monmouth, Lakeview, or Jardine, and then possibly again at the commencement of Plaintiff's due process petition.

While such moves will undoubtedly disrupt R.K.'s routines, they are inevitable in a case such as this, where it is impossible for the child to stay in the facility that has been servicing his needs pending the outcome of the due process petition.  Even assuming this Court affirms the ALJ's determination that R.K. should be subject to interim placement at the in-district program, he might still have to be moved twice if the ALJ ultimately determines that the IDEA mandates a different placement - once from CSH to the in-district program, and then again to whatever placement the ALJ ultimately orders.  More importantly, M.K., who has moved for a preliminary injunction on R.K.'s behalf and for his benefit, does not perceive or argue that R.K. will be harmed by any change in his placement.  Accordingly, this Court cannot find that any greater hardship would be caused by granting Plaintiff's motion than by denying it.

Because, as this Court has found, R.K. will suffer irreparable harm if he is not provided with a facility and services comparable to those provided at CSH, the balance of the hardships indisputably tips in Plaintiff's favor to the extent Plaintiff seeks an injunction mandating such comparable services.

### F.    Public Interest

Before this Court can issue a preliminary injunction, it must also determine whether doing so is in the public interest.  See P.C. Yonkers, 428 F.3d at 508.  Defendant argues that granting Plaintiff's motion would undermine the IDEA administrative adjudication process by disrupting the ALJ's findings despite her familiarity with the subject matter of this case, and in

24

the face of an upcoming hearing meant to adjudicate the merits of Plaintiff's due process petition. This Court cannot agree. As this Court has explained, it is well established that district courts may review ALJ stay-put orders while an underlying due process petition is pending before an ALJ. See Murphy, 297 F.3d at 199; Johnson, 287 F.3d at 1180. Such immediate adjudication of stay-put determinations by the ALJ actually advances the public interest of preserving the services being offered to students with disabilities. Murphy, 297 F.3d at 199. This Court therefore finds that the public interest supports enjoining a stay-put order that contravenes the IDEA.

### G.        Weighing Of The Equities

Having considered the four factors of the preliminary injunction analysis, this Court determines that all factors favor granting injunctive relief to ensure that R.K. is placed in a facility comparable to CSH during the pendency of Plaintiff's due process petition. For the reasons explained herein, the in-district facility, as it currently exists, is unable to serve the needs of R.K. because of the deficiencies in its physical plant. This Court will therefore enjoin the ALJ's order, and direct that R.K. be placed in one of the three alternative facilities presented by Plaintiff.

### H.        The Appropriate Stay-Put Placement For R.K.

This Court, having considered the three alternatives to in-district placement presented by Plaintiff, finds that the stay-put provision of the IDEA would be served best by placing R.K. at the Lakeview facility with a one-on-one RN pending adjudication of Plaintiff's due process petition by the ALJ. While the Monmouth, Lakeview, and Jardine programs offer comparable services, the evidence before the Court indicates that Lakeview is the facility most similar to

25

CSH.

While Monmouth was forwarded by Plaintiff as the preferred placement for R.K., this Court finds that requiring R.K. to commute a total of two hours each-day is not in the child's best interest, and renders the program significantly dissimilar from the CSH program, which is located only 15 minutes from R.K.'s home.  (Maccia Supp. Cert., ¶ 6.)  This Court also notes that the evidence in the record regarding Jardine does not specify the student:staff ratio in R.K.'s classroom.  This gap in the evidence precludes this Court from finding that Jardine can offer R.K. attention and services comparable to those which he has been receiving at CSH.

The evidence in the record regarding Lakeview, however, demonstrates that the facility is similar to CSH, such that placing R.K. at the facility would serve the goals of the IDEA's stay-put provision.  Both CSH and Lakeview are located within fifteen to twenty minutes of R.K.'s home; have a 2:1 student:staff ratio; provide comparable therapies and other services; and have physical plants which are designed to accommodate R.K.'s feeding needs, therapy needs, toileting needs, and his inability to ambulate like a normal child.  (Maccia Supp. Cert., ¶ 5; Kozlik Cert., ¶¶ 10, 11, Exh. C, Lakeview handbook; Venckus Affs., Certification, ¶¶ 3, 5-7, 9-10.)  This Court, looking to the evidence in the record, can locate no significant difference between the physical plant and services at CSH and Lakeview.  Accordingly, this Court finds that Lakeview is the best temporary placement for R.K. pending the outcome of Plaintiff's due process petition before the ALJ.[8]

_____

[8]This Court emphasizes that its decision relates only to the appropriate placement of R.K. under the stay-put provision of the IDEA.  This Court's placement of R.K. at the Lakeview facility is an interim decision, which is effective only until such time as the ALJ decides Plaintiff's due process petition on its merits.  The ALJ is currently set to hear argument and evidence on Plaintiff's petition in December 2006.

## III.  <u>CONCLUSION</u>

For the reasons stated above, this Court grants Plaintiff's motion for a preliminary

injunction, and grants Defendant's motion to dissolve the TRO.


Dated: October 31, 2006                              s/Joseph A. Greenaway, Jr.
                                                 JOSEPH A. GREENAWAY, JR., U.S.D.J.